IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JORDAN OUTDOOR ENTERPRISES, LTD.,      *

    Plaintiff,      *

vs.      *

J&M CONCEPTS, LLC,      *

    Defendant      *

_____      *   CASE NO. 4:18-CV-126 (CDL)

COUNTRY BREEZE VENTURES, LLC,      
                                      *

    Plaintiff,      
                                        *

vs.      *

JORDAN OUTDOOR ENTERPRISES, LTD.,      
                                        *

    Defendant.      *

_____

<u>O R D E R</u>

J&M Concepts, LLC ("J&M") obtained a license to use intellectual property owned by Jordan Outdoor Enterprises, Ltd. ("Realtree") on J&M's energy drink containers. Realtree brought an action against J&M, asserting that J&M breached the License Agreement by failing to pay royalties. The Court concluded that Realtree was entitled to summary judgment on its claim that J&M owed royalties that became due under the License Agreement before J&M assigned the license to Country Breeze Ventures, LLC ("Country Breeze") on September 25, 2015. *Jordan Outdoor Enters., Ltd. v. J&M Concepts, LLC*, No. 4:18-CV-126 (CDL), 2020

WL 2449278, at *6 (M.D. Ga. May 12, 2020).  The Court also found
that Realtree was entitled to a royalty audit to determine what
royalties J&M owed but had not paid.  *Id.*  And, the Court
concluded that Realtree was entitled to the fees and costs of
bringing this action under § 29.4 of the License Agreement.  *Id.*
The Court ordered further briefing on these issues.  After
considering the supplemental briefs and the evidence submitted
by the parties, the Court awards Realtree $339,419.85 in
royalties and interest and $118,304.80 in reasonable attorney's
fees and expenses.  The parties have had ample opportunity to
submit all relevant evidence for the Court's consideration, and
they have failed to demonstrate that an oral evidentiary hearing
is necessary.  Accordingly, the motion for an oral hearing on
the amount of royalties is denied.

DISCUSSION

## I.   Royalties and Interest

Realtree conducted a royalty audit and concluded that J&M
owes royalties and interest totaling $1,109,587.00.    J&M
contends that Realtree is entitled to $167,833.00 in past-due
royalties and $15,128.00 in interest.  Realtree's royalty
auditor split the royalty claims into nine categories:

| # | Description | Amount |
|---|---|---|
| M-1 | Missing/Inadequate Information | $43,750 |
| M-2 | Interest Due From Late Payment of Royalties | $42,794 |
| M-3 | Not Reporting Pallet and Freight Sales | $7,705 |
| M-4 | Off Invoice Discounts | $529,107 |

| #    | Description                                               | Amount    |
|------|-----------------------------------------------------------|-----------|
| M-5A | Underreported Royalties as Calculated by J&M              | $167,833  |
| M-5B | Interest Due as Calculated by J&M through 6/30/20         | $13,942   |
| M-6  | Additional Interest Due On Underreported Royalties        | $220,602  |
| M-7  | Unlicensed and Not Reported Camp Chair Sales Revenues     | $37,911   |
| M-8  | Excess Returns                                            | $943[1]   |
| M-9  | Estimated Royalty Audit Costs                             | $45,000   |

Royalty Audit Report 17, ECF No. 92 at 19.  The Court will address each claimed category in turn.

As a preliminary matter, the Court must address the parties' dispute about the contractual interest rate.  J&M and Realtree agreed that if a royalty payment was "not received by [Realtree] when due," J&M would pay Realtree "interest charges at an annual rate of 1.5% per month beginning upon the date said royalty payment was due."  License Agreement 11.6, ECF No. 26-3. J&M takes the position that it means simple interest in the amount of 1.5% per year.  Realtree argues that it means interest in the amount of 1.5% per month (annualized to 18% per year), compounded monthly.  The Court agrees with Realtree that the License Agreement provides for interest in the amount of 1.5% per month.  To read the License Agreement as J&M suggests would ignore the "per month" language.  But nothing in § 11.6 states that the parties agreed to compound interest.  As Realtree

---

[1] Realtree contends that in the event the Court finds that claim category M-4 is invalid, then the correct amount for M-8 is $2,968.00. J&M does not disagree.

acknowledges, the Eleventh Circuit recently concluded that a contract providing for interest at a rate of "1.5% per month" did "not establish that the parties agreed to compound interest." *Caradigm USA LLC v. PruittHealth, Inc.*, 964 F.3d 1259, 1280 (11th Cir. 2020).  In light of this precedent, the Court finds that the similar language in the License Agreement does not authorize an award of compound interest.

A.   M-1: Missing/Inadequate Information

Realtree's auditor asserts that J&M is liable for a contractual penalty under § 12.4 of the License Agreement.  That section provides that if J&M submits incomplete information for a royalty audit, then it must pay an additional charge in the amount of 25% of the contractual minimum guarantee.  License Agreement § 12.4.   J&M contends that it submitted adequate information for the royalty audit.   In its summary judgment order, the Court did not determine that Realtree was entitled to a penalty under § 12.4; the issue was not clearly presented to the Court because the royalty audit had not yet been completed. Now, the parties disagree on whether J&M submitted incomplete information for the royalty audit.  The Court did not authorize Realtree to file an out-of-time summary judgment motion on this issue, Realtree did not seek leave to file such a motion, and Realtree did not actually file such a motion.  Therefore, the Court cannot find as a matter of law that Realtree is entitled

to a penalty under § 12.4 for submitting incomplete information
to the royalty auditor.   Claim category M-1 shall not be
included in Realtree's royalty award.

B.   M-2  Interest Due From Late Payment of Royalties

Realtree's auditor contends that J&M is liable for a
contractual penalty under § 11.6 of the License Agreement, which
states: "In the event the royalty payment and the accompanying
Royalty Report Form are not received by [Realtree] when due,
[J&M] agrees to pay [Realtree] interest charges at an annual
rate of 1.5% per month beginning upon the date said royalty
payment was due[.]"   License Agreement § 11.6.   Realtree's
auditor concluded that when J&M did make royalty payments, it
made some of them late, so the contractual penalty under § 11.6
applies.   Royalty Report 22, ECF No. 92 at 24.   J&M contends,
though, that Realtree waived the contractual penalty for any
late royalty payments that Realtree accepted from J&M before
September of 2015.   In its summary judgment order, the Court
concluded that Realtree established that J&M was significantly
behind on its royalty payments when J&M assigned the License
Agreement to Country Breeze in September 2015.   *Jordan Outdoor*,
2020 WL 2449278, at *5.   The Court thus determined as a matter
of law that Realtree was entitled to *unpaid* royalties and
interest on *unpaid* royalties.   *Id.* at *5-*6.   But the Court did
not conclude as a matter of law that Realtree was entitled to a

penalty under § 11.6 based on late royalty payments that Realtree accepted from J&M before the Country Breeze assignment. That issue was not clearly presented to the Court. The Court did not authorize Realtree to file an out-of-time summary judgment motion on this issue, Realtree did not seek leave to file such a motion, and Realtree did not actually file such a motion. Therefore, the Court cannot find as a matter of law that Realtree is entitled to a penalty under § 11.6 of the License Agreement for the late payments listed in claim category M-2. Claim category M-2 shall not be included in Realtree's royalty award.

    C.   <u>M-3: Not Reporting Pallet and Freight Sales</u>

    J&M agreed to pay Realtree a royalty of "5% of Net Sales" of "Team Realtree Camouflage Beverages." License Agreement § 11.1; License Agreement Schedule A. The term "net sales" is defined as J&M's "gross sales (the gross invoice amount billed customers), whether wholesale or retail, for Licensed Products." License Agreement § 1.6. The term "net sales" "does not include discounts for cash terms, freight, advertising, class of trade discount, etc." but "does include allowances for" certain returns. *Id.* And, "[n]o costs incurred in the manufacturing, selling, advertising, and distribution of the Licensed Products shall be deducted." *Id.*

The royalty auditor reviewed J&M's invoices and noted that while some of them did not include separate charges for freight or pallets, some of them charged a separate freight fee and charged a price for each pallet.  In calculating the "net sales," J&M excluded these freight and pallet costs, arguing that charges for freight and pallets are not for "Licensed Products" within the meaning of the License Agreement and that it should not have to pay royalties on these amounts.  But the License Agreement states that J&M should not deduct costs incurred in the "manufacturing, selling, advertising, and distribution of Licensed Products."  License Agreement § 1.6. The freight and pallet charges are costs incurred in distributing the Licensed Products, so they should not have been excluded from "net sales" used to calculate the royalties.  The auditor concluded that the unpaid royalties associated with freight and pallet fees were: $1,017.00 due January 30, 2014; $1,188.00 due January 30, 2015; and $532.00 due December 31, 2015, for a total of $2,737.00.  The interest due on this amount at a rate of 1.5% per month simple interest is $3,084.87. Realtree shall be awarded $5,821.87 for claim category M-3.

D.   M-4: Off Invoice Discounts

Realtree's royalty auditor asserts that J&M provided discounts to customers that are not reflected on the invoices. Again, J&M agreed to pay Realtree a royalty of "5% of Net Sales"

of "Team Realtree Camouflage Beverages."   License Agreement
§ 11.1; License Agreement Schedule A.   And, as discussed above,
the term "net sales" is defined as J&M's "gross sales (the gross
invoice amount billed customers), whether wholesale or retail,
for Licensed Products" and "does not include discounts for cash
terms, freight, advertising, class of trade discount, etc."
License Agreement § 1.6.   J&M also agreed that it would not "use
the Licensed Products for combination sales, premiums, giveaways
or for any similar method of merchandising without prior written
consent of" Realtree and that it would "refrain from
distributing Licensed Products for any purpose other than sale
or limited sale's samples without prior written consent of"
Realtree.   *Id.* § 7.1.

Based on J&M's financial statements, Realtree's auditor
believes that J&M offered sales incentives to its customers,
including volume discounts and promotional discounts.   The
auditor acknowledges that when J&M's accountant calculated the
underreported royalties, it "added back to net sales all
discounts that had been posted to the financial records."
Royalty Report 25.   The auditor suspects, however, that there
were additional discounts that were not posted to J&M's
financial records.   J&M contends that there were not.   The crux
of the dispute seems to be whether "gross invoice amount billed
customers" means (1) the gross invoice amount that J&M billed to

its customers—which were all distributors of the Licensed Products—or (2) the wholesale or retail price the distributors received from their customers. According to Realtree, none of the sales to distributors reflects the true wholesale or retail price that was ultimately paid by the distributors' customers, and that must be calculated by delving into the distributor agreements and vendor agreements. Since J&M did not produce those agreements, the auditor estimated the wholesale or retail price that was paid to J&M's customers, the distributors.

Under the plain terms of the License Agreement, royalties must be paid on J&M's "gross sales (the gross invoice amount billed customers), whether wholesale or retail." License Agreement § 1.6. The Court is not convinced that there is any ambiguity in this language: the License Agreement required J&M to pay a royalty based on the gross invoice J&M billed to its customers. Neither side presented evidence of a business custom that would change the meaning of § 1.6, and there is no evidence that the parties intended for J&M to pay a royalty on gross invoice amounts that were billed to someone other than J&M's customers, the distributors. Accordingly, the Court finds that J&M was reasonable to calculate royalties based on the gross invoice amounts billed to its customers.

Realtree also argues that it is obvious J&M offered off-invoice discounts to some of its distributor customers because

different distributors paid different prices for the Licensed Products. Nothing in the License Agreement prohibits J&M from charging its customers different prices for the Licensed Products. And nothing in the present record elaborates on the pricing structure for Licensed Products or permits the Court to conclude, as a matter of law, that when J&M offered different sales prices to different distributors at different times in different locations, it was giving an impermissible "discount" rather than setting the price based on market conditions as they existed at the time. Accordingly, the Court finds that Realtree has not established that J&M owes it additional royalties for off-invoice discounts, and claim category M-4 shall not be included in Realtree's royalty award.

E.    M-5: Underreported Royalties as Calculated by J&M

Claim category M-5 includes J&M's calculation of royalties that J&M admits it owes to Realtree: $167,833.00. That amount shall be included in the royalty award.

F.    M-6: Interest Due on Underreported Royalties

Claim category M-6 is Realtree's calculation of interest due on the $167,833.00 in royalties that J&M acknowledges are due to Realtree. As discussed above, J&M owes interest on unpaid royalties at a rate of 1.5% per month simple interest. J&M does not dispute the royalty auditor's conclusion that the royalty payment due on January 30, 2015 in the amount of

$43,558.00 remains unpaid, as does the royalty payment due on December 31, 2015 in the amount of $124,274.00.  Accordingly, the royalty award shall include interest due as of the date of today's Order in the amount of $162,796.98.

G.  M-7: Unlicensed and Not Reported Camp Chair Sales Revenues

In claim category M-7, the royalty auditor determined that J&M sold 1,053 "Realtree Folding Camp Chairs" for $10,588.00. He also found that J&M owes Realtree 100% of this amount, not just royalties in the amount of 5% of net sales of the camp chairs.  The present record contains little information about the acquisition and sale of these camp chairs.  J&M asserts that it purchased the chairs as an advertising expense and then resold them.  Realtree contends that the camp chairs were "Licensed Products" under the License Agreement, subject to a royalty when J&M sold them.  The License Agreement defines "Licensed Products" to mean "any product or part thereof bearing any of the Licensed Design(s) and Copyright(s), and more specifically set forth in the attached Schedule "A."  License Agreement § 1.4.  It is clear that the point of the License Agreement was to permit J&M to use Realtree's camouflage patterns on the "Licensed Products Listed on Schedule 'A.'" License Agreement 1.  Schedule A defines "Licensed Products" as "Team Realtree Camouflage Beverages."  Thus, the camp chairs are

11

not "Licensed Products."   Nothing in the License Agreement suggests that J&M owes a royalty for the sale of items that are not "Licensed Products."   Realtree's real argument seems to be that J&M's sale of the camp chairs infringed Realtree's intellectual property rights and that Realtree is entitled to damages as a result.   But that claim is clearly not before the Court in this action.[2]   For these reasons, claim category M-7 shall not be included in Realtree's royalty award.

### H.   M-8: Excess Returns

J&M does not dispute that it owes Realtree $2,968.00 for excess returns.   Accordingly, that amount shall be included in the royalty award.

### I.   M-9: Estimated Royalty Audit Costs

In claim category M-9, Realtree seeks to recover $45,000 as the cost of the royalty audit.   This amount is an "[e]stimated royalty audit costs," but it does not include an actual amount of the cost of the audit, nor is there any evidence of the actual cost in the present record.   Under the scheduling order entered by the Court for this stage of the litigation, "Realtree may file a supplemental motion to recover any fees and costs that it maintains J&M owes under the License Agreement in connection with determining the amount of royalties and interest

---

[2] With discovery long complete and trial on the horizon, the Court declines to permit Realtree to amend its complaint to assert new claims for trademark and copyright infringement.

owed that were not already sought in a prior motion for fees and costs." Order 4-5 (June 4, 2020), ECF No. 68. The Court noted it would "review the expenses to assure that they are reasonable and consistent with the contract between the parties." *Id.* Thus, claim category M-9 is excluded from the present award, though Realtree may file the supplemental motion for fees and costs associated with the royalty audit, as contemplated by the scheduling order.

J&M is clearly entitled to recover reasonable costs of the royalty audit. Under the License Agreement, if a royalty audit "reveals a deficiency of more than five (5%) percent of the royalty paid during any given calendar year included in the audit, [J&M] shall reimburse [Realtree] for the cost of the services of the representatives and for other costs relating to the audit, including but not limited to plane fare, meals, rooms, rental car, etc." License Agreement § 12.4. J&M points out that while the Court found that Realtree was entitled to summary judgment on its claim for a royalty audit to determine the amount of the deficiency, it did not conclude as a matter of law that Realtree was entitled to the costs of the royalty audit. That issue was not presented to the Court, nor could it have been because before the royalty audit there was no evidence that the deficiency was more than five percent of the royalty paid during any of the calendar years included in the audit.

13

J&M has now conceded that it owes $43,558.00 in additional royalties for 2014 (far more than five percent of the $199,499.00 royalty J&M paid for 2014), and J&M admits that it did not pay any royalties for 2015. And, based on the additional royalties due as discussed above, there was also a deficiency of more than five percent of the royalty paid in 2013. Thus, § 12.4 of the License Agreement authorizes Realtree to recover the costs of the royalty audit. Moreover, § 29.4 of the License Agreement requires J&M to reimburse Realtree "for all reasonable expenses, legal fees and costs required to enforce [J&M]'s obligations" under the License Agreement. License Agreement § 29.4. In summary, Realtree may recover reasonable costs of the royalty audit and reasonable legal fees associated with presenting the issue to the Court.

Within twenty-one days of the date of this Order, Realtree may file its supplemental motion for fees and costs associated with the royalty audit. The Court sees no need for extensive briefing on this simple issue. Realtree shall present a short, succinct brief citing evidence of the auditor's fee and costs. It shall indicate what portion of the auditor's fee was incurred determining royalties based on strained interpretations of the License Agreement that the Court rejected in this Order. Similarly, if Realtree seeks attorney's fees associated with presenting the royalty audit to the Court, it should exclude

14

from its fee request those fees and costs that are awarded in § II below, as well as those incurred pursuing theories based on interpretations of the License Agreement that the Court rejected. Any response shall be due fourteen days after the supplemental motion is served. There shall be no reply, and there shall be no extensions.

J. Summary of Royalties and Interest

As discussed above, Realtree established that it is entitled to royalties and interest in the following amounts:

| # | Description | Amount |
|---|---|---|
| M-3 | Not Reporting Pallet and Freight Sales | $5,821.87 |
| M-5 | Underreported Royalties as Calculated by J&M | $167,833.00 |
| M-6 | Additional Interest Due On Underreported Royalties | $162,796.98 |
| M-8 | Excess Returns | $2,968.00 |
| | **TOTAL** | **$339,419.85** |

## II. Attorney's Fees and Costs

In addition to royalties and interest, Realtree seeks the legal fees and expenses it incurred in this action. Section 29.4 of the License Agreement states: "[J&M] shall reimburse [Realtree] for all reasonable expenses, legal fees and costs required to enforce [J&M's] obligations under this Agreement." License Agreement § 29.4. Realtree won summary judgment on its breach of contract claim against J&M, so J&M "shall reimburse [Realtree] for all reasonable expenses, legal fees and costs required to enforce [J&M]'s obligations" under the License

Agreement. *Id.*   Since there was no evidence in the summary judgment record regarding the amount of these fees and costs, the Court permitted Realtree to supplement its summary judgment motion with evidence of the amount of fees and costs.  Realtree seeks more than $300,000 in attorney's fees and costs, arguing that these fees and costs were all necessary to enforce J&M's obligations under the License Agreement.  J&M contends that Realtree should be awarded no more than $84,462.41 in fees and $701.05 in costs.

The parties agree that because the License Agreement does not define "reasonable" legal fees and costs, the Court should conduct a lodestar analysis to determine reasonable attorney's fees required to enforce J&M's obligations under the License Agreement.  The lodestar "is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Ela v. Destefano*, 869 F.3d 1198, 1203 (11th Cir. 2017) (quoting *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (per curiam)).  There is "a 'strong presumption' that the lodestar is the reasonable sum the attorneys deserve."  *Id.* (quoting *Bivins*, 548 F.3d at 1350).[3]  "The fee applicant bears

---

[3] In determining whether the lodestar is reasonable, the district courts are to consider twelve factors: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the

the burden of establishing entitlement and documenting the appropriate hours and hourly rates." *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988).

A.   Hours Reasonably Expended

In determining the number of hours reasonably expended, the courts generally deduct time that was not reasonably expended on the litigation. *See, e.g., Am. Civil Liberties Union of Ga. v. Barnes*, 168 F.3d 423, 435 (11th Cir. 1999); *cf. Maner v. Linkan LLC*, 602 F. App'x 489, 491–92 (11th Cir. 2015) (per curiam) (finding no abuse of discretion where district court excluded from the plaintiff's Title VII fee award time her attorneys spent on her state unemployment benefits application). "Time spent is reasonable, and thus compensable, if it would be proper to charge the time to a client." *In re Home Depot Inc.*, 931 F.3d 1065, 1087 (11th Cir. 2019). "As with a client, counsel should not include in the lodestar hours that are 'excessive, redundant or otherwise unnecessary.' " *Id.* (quoting *Norman,* 836 F.2d at 1301). The courts must also deduct time spent on discrete, unsuccessful claims. These are claims "that are based on different facts and legal theories" that can be treated "as if they had been raised in separate lawsuits." *Hensley v.*

---

circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Bivins*, 548 F.3d at 1350 n.2.

*Eckerhart*, 461 U.S. 424, 434-35 (1983).  "If fee applicants do not exercise billing judgment, courts are obligated to do it for them, to cut the amount of hours for which payment is sought, pruning out those that are 'excessive, redundant, or otherwise unnecessary.'" *Barnes*, 168 F.3d at 428.

Here, Realtree contends that it is entitled to recover fees for all the work its attorneys did in this action, for a substantial portion of the work its attorneys did in a state court action that Country Breeze brought against Realtree and the Coca-Cola Company, and for the costs Realtree incurred under its indemnification agreement with Coca-Cola based on J&M's non-party subpoena to Coca-Cola.  It is not.  Under the plain language of the License Agreement, Realtree is only entitled to "all reasonable expenses, legal fees and costs required to enforce [J&M's] obligations under this Agreement." License Agreement § 29.4.  In its summary judgment order, the Court only decided that J&M was liable as a matter of law under § 29.4 of the License Agreement for the costs and fees Realtree incurred in pursuing its breach of contract claim against J&M in this action.  The Court did not find as a matter of law that Realtree is entitled to any other costs or fees.  So, Realtree is entitled to recover the fees and costs it expended to win its breach of contract claim against J&M based on J&M's failure to pay royalties that accrued before the license was assigned to

Country Breeze.  To win this breach of contract claim against J&M and establish its right to recover attorney's fees, Realtree demonstrated that (1) it had a License Agreement with J&M, (2) J&M did not pay royalties as required by the License Agreement, (3) Realtree did not forgive the royalties, (4) there was no novation when J&M assigned the License Agreement to Country Breeze, and (5) the License Agreement required J&M to reimburse Realtree for fees and costs required to enforce J&M's contractual obligations.

Realtree may not, however, recover fees and costs associated with claims other than its breach of contract claim for pre-assignment royalties.  These costs and fees include the costs and fees Realtree spent defending J&M's counterclaims for breach of contract (which failed because J&M could not prove damages caused by the alleged breach) and misrepresentation (which remains to be tried by a jury).[4]  Both counterclaims center upon the Realtree-Mello Yello campaign and the parties' dispute over the License Agreement's exclusivity provision. They are distinct from Realtree's claim that J&M did not pay royalties that were due before the County Breeze Assignment.

---

[4] The only damages that J&M claimed as a result of Realtree's alleged breach of contract were damages that J&M suffered *after* the assignment to Country Breeze since Country Breeze could not meet its payment obligations to J&M.  Thus, Realtree's breach of contract claim for pre-assignment royalties—which J&M admitted it owed but claimed Realtree forgave—is not at all intertwined with J&M's attempted breach of contract claim against Realtree.

The Court thus finds that the fees and costs Realtree incurred solely for defending the counterclaims were not required to enforce J&M's obligations under the License Agreement.[5]

Having concluded that Realtree may only recover the costs and fees it expended to win its pre-assignment breach of contract claim against J&M, the Court must determine which requested fees and costs should be included in that amount. Realtree seeks $94,472.26 in fees and costs associated with discovery in the state court action that Country Breeze brought against Realtree Coca-Cola. But Realtree did not establish that these fees and costs were required to enforce J&M's obligations under the License Agreement. Realtree asserts that some of the discovery was used in this action, but it did not explain which discovery items from the state court action were necessary to enforce J&M's obligations under the License Agreement, and it did not point to any time entries in its billing records that are associated with specific discovery items that Realtree used to pursue its successful breach of contract claim in this

---

[5] The nonrecoverable costs and fees should also include those incurred pursuing Realtree's claim against J&M for post-assignment royalties. Realtree lost that claim, which is distinct from the claim for pre-assignment royalties. Since Realtree did not establish that J&M had a contractual obligation to pay post-assignment royalties, the fees and costs for this claim are not recoverable under § 29.4 of the License Agreement. But J&M does not argue that any costs and fees associated with the post-assignment royalties claim should be excluded, perhaps conceding that it was reasonable for Realtree's lawyers to track the time associated with this claim together with Realtree's claim for pre-assignment royalties. Thus, the Court does not make any reductions for time spent on the post-assignment royalty claim.

action.[6]  Without such evidence, Realtree did not meet its burden of establishing that fees and costs incurred in separate litigation were expended to win its pre-assignment breach of contract claim against J&M in this action.

Realtree also seeks $46,020.50 in fees and costs that Coca-Cola incurred in responding to J&M's subpoena in this action. Realtree had a contractual obligation to indemnify Coca-Cola for these fees and costs, and now Realtree contends that J&M should pay the fees and costs.  Again, § 29.4 of the License Agreement only permits Realtree to recover fees and costs it expended to win its pre-assignment breach of contract claim against J&M. Realtree did not establish that the amount it paid to Coca-Cola to satisfy its contractual indemnification obligation was also a cost Realtree expended to win its pre-assignment breach of contract claim against J&M.  While the evidence Coca-Cola produced in response to J&M's subpoena may certainly be relevant to J&M's misrepresentation counterclaim that remains to be tried by a jury, it was not necessary for Realtree to establish that J&M is liable for breach of contract based on J&M's failure to pay royalties that accrued before the Country Breeze assignment Accordingly, the Court finds that Realtree is not entitled to

---

[6] In its reply brief, Realtree cited for the first time a handful of state court discovery items that were referenced in the parties' summary judgment briefing and the Court's summary judgment order, but Realtree did not point the Court to where in its billing records the Court might find the corresponding time entries associated with these discovery items.

recover the Coca-Cola fees and costs from J&M under § 29.4 of the License Agreement.

The next question is how much of the remaining $165,140.24 in claimed fees and expenses Realtree may recover. Given that the Court must deduct time that was not reasonably expended on Realtree's successful claim for which attorney's fees are recoverable under § 29.4 of the License Agreement, fee counsel must present "records to show the time spent on the different claims, and the general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity." *Norman*, 836 F.2d at 1303. "A well-prepared fee petition also would include a summary, grouping the time entries by the nature of the activity or stage of the case." *Id.* Unfortunately, Realtree's fee application does not include a helpful summary of time entries, even though its affidavits in support of its fee application identify eight or nine different categories of work the lawyers did for Realtree. *See* Lomax Aff. ¶ 7, ECF No. 67-1; Westby Aff. ¶ 7, ECF No. 67-2. Instead, in its chart of fees and expenses, Realtree lumps together all the fees and expenses associated with the litigation in this Court (without even distinguishing between the fees and the expenses), apparently expecting the Court to sift through the invoices Realtree

received from counsel to find the answers. *See* Pl.'s Mot. to Supplement 4, ECF No. 67.

The Court spent a significant amount of time reviewing Realtree's billing records. Based on those records, Realtree seeks to recover the following fees associated with this litigation: $40,531.50 in legal fees for 137.7 hours of work performed by Robert Lomax with the firm of Robert R. Lomax, LLC and $166,106.00 in legal fees for 322.4 hours of work performed by various lawyers with the firm of Nelson Mullins Riley & Scarborough. J&M seeks several specific reductions to the hours. The Court will consider each proposed reduction in turn.

First, J&M identified 23.7 hours in time entries that are redacted, ostensibly to protect privileged communications. J&M argues that these time entries are so heavily redacted that it is impossible to tell what the hours are for or if they were reasonably expended to enforce J&M's obligations under the License Agreement. For example, on September 13, 2019, M.C. Walker billed 3.1 hours for "Research and draft [REDACTED]." Westby Aff. Ex. B, Nelson Mullins Oct. 9, 2019 Bill, ECF No. 67-2 at 15. On October 2, 2019, L. Westby billed 0.8 hours for "Review and analyze case law [REDACTED]." Westby Aff. Ex. 2, Nelson Mullins Nov. 25, 2019 Bill, ECF No. 67-2 at 19. The list goes on. The Court reviewed the time entries flagged by J&M in pink (*see* ECF No. 69-3) and agrees that the time entries are so

vague due to redactions that it is not possible to tell whether the time was reasonably expended to win Realtree's pre-assignment breach of contract claim against J&M.[7]   Accordingly, the Court excludes these 23.7 hours from the lodestar.

Second, J&M objects to 70.5 hours that Realtree's lawyers spent seeking a protective order and complying with it.   J&M contends that Realtree lawyers over-designated much of its document production as "highly confidential" and then spent too much time redacting documents and deposition exhibits to comply with the protective order.   The protective order was entered with the consent of the parties, and it provided a process for challenging the confidentiality designations.   Consent Protective Order ¶¶ 7-8, ECF No. 14.   Therefore, Realtree was required to keep certain exhibits confidential and had to file redacted versions of its briefing on the public docket (as did J&M).   Given that the parties agreed to this process and that J&M did not challenge the confidentiality designations using the process set forth in the protective order, the Court declines to exclude these 70.5 hours from the lodestar.

Third, J&M argues that the Court should exclude 11.5 hours that relate solely to J&M's counterclaims.   As discussed above, the fees Realtree incurred solely for defending the

---

[7] If anything, J&M was generous in its concession that some of the other heavily redacted time entries should be included in the lodestar.

counterclaims were not required to enforce J&M's obligations under the License Agreement.   The Court reviewed the time entries flagged by J&M in blue (*see* ECF No. 69-3) and agrees that most of the time entries are not recoverable because they are just for the lawyers' work defending the counterclaims.   The Court is not convinced, however, that it was unreasonable for Robert Lomax to spend 1.2 hours on his initial review of J&M's Answer and Counterclaims, so the Court declines to exclude that time.   The Court does exclude the other 10.3 hours of time solely spent defending J&M's counterclaims.

Fourth, J&M objects to time entries totaling 26.0 hours that were spent on a motion for sanctions that Realtree never filed (*see* ECF No. 69-3 items flagged in purple).   Realtree does not challenge J&M's identification of these time entries.   The parties agree that the unfiled motion related to potential recordings of conversations between personnel from J&M and Realtree.   Realtree asserts that its lawyers started researching a motion for sanctions and sent J&M a letter asking for the recordings.   The parties agree that the matter was quickly resolved when J&M confirmed that no recordings existed.   It is unclear to the Court why Realtree's lawyers spent so many hours working on a motion for sanctions before determining that the recordings did not even exist.   And, Realtree did not explain why the time spent on the unfiled motion for sanctions was

reasonably expended to win Realtree's pre-assignment breach of contract claim against J&M. The Court does not doubt that it was reasonable for Realtree's counsel to research whether the recordings existed and whether a failure to produce them might warrant sanctions, but this research should not have taken more than a few hours given how quickly the issue was resolved. Accordingly, the Court finds that Realtree's counsel reasonably expended 5.0 hours on the potential sanctions issue. The Court strikes the other 21.0 hours from the lodestar.

Fifth, J&M identified 89.2 hours that Realtree's lawyers spent on the fee application, including 46.6 hours for preparing the motion and 42.6 hours for reviewing and redacting the fee invoices. Realtree does not dispute that its lawyers billed 89.2 hours in connection with the supplement or challenge J&M's identification of these time entries. The Court understands that it took time and effort to review the billing records, but it is not clear why counsel needed more than forty hours to do so given that Realtree seeks to recover fees for every hour listed on the billing statements and did not bother to provide a useful summary that grouped the time entries by nature of the activity or stage of the case. Under these circumstances, twenty hours should have been plenty of time to review the billing statements. Likewise, counsel should have been able to draft its motion for fees in twenty-five hours; the motion

raised no novel issues and provided only a general explanation of the fees sought. For these reasons, the Court finds that counsel reasonably expended 45.0 hours on the fee application. The remaining 44.2 hours are excluded from the lodestar.

### B.    Reasonable Hourly Rate

The other component of the lodestar is the reasonable hourly rate. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299. Realtree employed Robert Lomax to handle this action, and it brought on board several Atlanta lawyers and support staff members with the firm of Nelson Mullins Riley & Scarborough to assist with the summary judgment briefing and the fee application. J&M does not dispute that the following hourly rates are reasonable: Mr. Lomax's hourly rate of $290 for work performed before 2020, Mr. Lomax's hourly rate of $325 for work performed in 2020, and Nelson Mullins partner Lucas Westby's hourly rate of $435.[8] The Court finds that these hourly rates are reasonable.

---

[8] The Court recently approved an hourly rate of $425 for an experienced lawyer in an employment discrimination case. *Trawick v. Carmike Cinemas, Inc.*, 430 F. Supp. 3d 1354, 1362 (M.D. Ga. 2019). The Court notes that Mr. Westby charged Realtree $485 per hour starting in 2020 and that Realtree's proposed lodestar is based on this rate for Mr. Westby's 2020 hours. But Realtree's motion for fees and Mr. Westby's affidavit only state that $435 is a reasonable hourly rate for Mr. Westby, so that is the rate the Court will use in calculating the lodestar. Pl.'s Mot. for Fees 6, ECF No. 67; Westby Aff. ¶ 8.

The parties disagree on the reasonable hourly rates for the Nelson Mullins associates, paralegals, and support staff. Mr. Westby asserts that, based on the prevailing billing rates for legal services provided by Atlanta lawyers, $295 is a reasonable hourly rate for Shaniqua Singleton, who has more than three years of litigation experience. Westby Aff. ¶ 8. Mr. Westby also asserts that $300 is a reasonable hourly rate for Megan Walker, an associate who graduated from law school in 2019.[9] *Id.* ¶ 9. And he asserts that $235 is a reasonable hourly rate for the paralegals who worked on this case. All of these rates are based on the prevailing billing rates in Atlanta, Georgia.

Realtree "bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates." *Norman*, 836 F.2d at 1299. Here, "the 'relevant market' for purposes of determining the reasonable hourly rate for an attorney's services is" Columbus, Georgia because that is where the case was filed. *Barnes*, 168 F.3d at 437. Realtree however, contends that it should recover at the Atlanta rates. The Court understands that what a lawyer charges his paying clients "is powerful, and perhaps the best, evidence of his market rate; that is most likely to be what he is paid as

---

[9] Mr. Westby's affidavit does not provide any information about Ms. Walker's legal experience, but J&M represents that, based on its review of the Nelson Mullins website, Ms. Walker graduated from law school in 2019. Mr. Westby's affidavit does not explain why Ms. Walker's rate is higher than Ms. Singleton's.

'determined by supply and demand.'" *Dillard v. City of Greensboro*, 213 F.3d 1347, 1354–55 (11th Cir. 2000) (per curiam) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). The Court also understands that Realtree decided to hire Atlanta lawyers to work on this matter and that it paid the Atlanta rates reflected in the invoices.

Still, under the lodestar method for calculating a reasonable fee, which Realtree asked the Court to apply, a reasonable rate is one that is in line with the market rate, which "means the hourly rate charged in the local legal market by someone with expertise in the area who is willing and able to take the case, if such an attorney exists." *Barnes*, 168 F.3d at 437. "If a fee applicant desires to recover the non-local rates of an attorney who is not from the place in which the case was filed, he must show a lack of attorneys practicing in that place who are willing and able to handle his claims." *Id.* (concluding that the district court "clearly erred in awarding non-local rates without finding that the plaintiffs had carried their burden of showing there were no attorneys" in the relevant market who could handle their claims).

Realtree did not submit any evidence that there were no attorneys who were willing and able to handle its claims at Columbus-area rates. In fact, Mr. Lomax, a seasoned Columbus attorney with more than thirty years of experience, did work for

Realtree on this matter, and he charged local rates that were, until 2020, less than the hourly rates for the Nelson Mullins first and third-year associates.  Realtree also did not present any evidence regarding the prevailing Columbus rates for first and third-year associates or for paralegals.  But J&M did.  It pointed to evidence that in 2019 a reasonable hourly rate for a first-year associate in Columbus was $215 (near the upper end of the range for first and second-year associates), a reasonable hourly rate for an eighth-year associate in Columbus was $250 (at the very low end of the range for similarly qualified associates), and that a reasonable hourly rate for paralegals was $175 (the top of the range for paralegals).  Newsom Aff. ¶¶ 17-18, ECF No. 69-1.  Based on this evidence, the Court finds that $215 is a reasonable hourly rate for Ms. Walker, $250 is a reasonable hourly rate for Ms. Singleton, and $175 is a reasonable hourly rate for the paralegals.

Finally, J&M objects to the hourly rates for a project assistant ($105) and two discovery professionals ($175 and $235).  The Court reviewed the billing records and concludes that the two discovery professionals performed paralegal functions (or at least functions that fall into a gray area of tasks that are appropriately performed by a paralegal) and that a reasonable hourly rate for their work is $175.  But the project assistant, who put exhibits into a folder, was

performing a purely clerical task. Realtree did not point to evidence of a reasonable hourly rate for purely clerical work. In the absence of such evidence, the Court finds that a reasonable hourly rate for the project assistant's time is the current federal minimum wage of $7.25 per hour.

C.   Calculation of the Lodestar

Based on the foregoing considerations, the lodestar amounts to $113,513.90.  The Court finds that this amount represents the reasonable attorney's fees for enforcing J&M's obligations under the License Agreement.[10]

| TIMEKEEPER | HOURS | RATE | TOTAL |
|---|---|---|---|
| R.R. LOMAX | 111.3 | $290.00 | $32,277.00 |
| R.R. LOMAX | 15.1 | $325.00 | $4,907.50 |
| L.A. WESTBY | 109.0 | $435.00 | $47,415.00 |
| S.L. SINGLETON | 91.0 | $250.00 | $22,750.00 |
| S.D. ARNOLD | 18.1 | $175.00 | $3,167.50 |
| M.E. BOLES | 7.8 | $175.00 | $1,365.00 |
| M.C. WALKER | 5.8 | $215.00 | $1,247.00 |
| A.T. WILLIAMS | 2.4 | $7.25 | $17.40 |
| S.B. O'TOOLE | 1.1 | $175.00 | $192.50 |
| C.J. BROWN | 0.6 | $175.00 | $105.00 |
| C.L. BUPP | 0.4 | $175.00 | $70.00 |
| **TOTAL** | **362.6** | | **$113,513.90** |

D.   Expenses

Realtree also seeks to recover the litigation expenses it paid in this action.  In its briefs, Realtree did not explain what those expenses are for or even state how much it seeks. Instead, Realtree lumps together the expenses in the lodestar

---

[10] In reaching this determination, the Court considered the relevant factors as listed *supra* note 3.

and says the Court can figure out what the expenses are from the billing records.[11]   The Court will begin with the expenses charged by Nelson Mullins.  Nelson Mullins claims total fees and expenses of $119,494.25 associated with this litigation.  Based on the Court's careful review of the Nelson Mullins billing records, $3,388.25 is for legal research expenses paid to Westlaw, Pacer, and Lexis; these fees were incurred during the same billing periods when Realtree's lawyers billed time for legal research.  J&M objects to these costs as unrecoverable. Legal research fees are not recoverable as a cost under 28 U.S.C. § 1920.  But § 29.4 of the License Agreement does not limit the recoverable expenses to costs under 28 U.S.C. § 1920. Instead, the License Agreement requires J&M to pay all reasonable expenses required to enforce J&M's obligations under the contract.  The Court thus declines to exclude the $3,388.25 for legal research fees.

Turning to the expenses on the billing records from Robert R. Lomax, LLC for this litigation, the invoices from the Lomax firm charged Realtree a total of $1,402.69 for clerk fees, Federal Express fees, and expenses associated with travel for the depositions of J&M representatives.  The Court is satisfied

---

[11] This method is completely unhelpful.  Expenses should be calculated separately and never lumped in with the lodestar, which is just used to calculate a reasonable attorney's fee based on hours reasonably expended and a reasonable hourly rate.

that these expenses are recoverable under § 29.4 of the License Agreement and therefore will permit Realtree to recover them.[12]

E.   The Award of Fees and Expenses

In summary, Realtree has established that it is entitled to recover $113,513.90 in reasonable attorney's fees and $4,790.94 in reasonable expenses under § 29.4 of the License Agreement, for a total of $118,304.80.[13]

CONCLUSION

As discussed above, the Court amends its summary judgment order to award Realtree $339,419.85 in royalties and interest plus $118,304.80 in legal fees and expenses associated with its breach of contract claim against J&M for pre-assignment royalties.

IT IS SO ORDERED, this 22nd day of February, 2021.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[12] To the extent that Realtree seeks to recover for expenses that were not invoiced on any bill from the Lomax firm or Nelson Mullins, Realtree did not provide sufficient evidence for the Court to determine the amount of those expenses or whether they were reasonably incurred to enforce J&M's obligations under the License Agreement.
[13] Depending on the outcome of the jury trial, Realtree may be entitled to additional attorney's fees and expenses.